UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:21-CR-00112 |
| | ) | |
| vs. | ) | |
| | ) | |
| CURTIS MITCHELL PAUL, | ) | |
| | ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDATION**

Before the Court is Defendant's Motion to Suppress Evidence and Incorporated Brief in Support [Doc. 16] seeking the suppression of evidence obtained when Defendant was seized on February 10, 2021. The United States filed a Response in Opposition to Defendant's Motion [Doc. 20]. The Court conducted an evidentiary hearing on the motion on August 29, 2022. Defendant's counsel, Cameron C. Kuhlman, Esq., Defendant, and Assistant United States Attorney B. Todd Martin, Esq. were present before the Court. FBI Task Force Officer Joe Jaynes testified at the hearing. This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion to Suppress [Doc. 16] be **DENIED**.

I.  BACKGROUND

On October 13, 2021, a federal grand jury returned an indictment against Defendant, charging him with violating 18 U.S.C. § 922(g)(1) by knowingly possessing a firearm, namely a Taurus Model PT-22, .22 caliber semi-automatic pistol, while being aware that he was prohibited from doing so because he is a convicted felon. In his Motion and Incorporated Brief, Defendant

argues that the seizure of his person on February 10, 2021, was not supported by reasonable suspicion, making the seizure unreasonable under the Fourth Amendment. [Doc. 16, p. 1-3]. He further contends that any evidence obtained as a result should be suppressed. In response, the United States avers that there was reasonable suspicion to support the seizure of Defendant, but additionally states that even if the actions taken by law enforcement constituted a violation of the Fourth Amendment, they were taken in good faith. [Doc. 20, p. 5, 9-10]. The United States contends that given that officers acted in good faith, the Court should not exclude the evidence obtained. *Id.*

Following the hearing in this matter, counsel was given the option of making closing arguments or filing any supplemental argument and authority they deemed necessary. The United States stood on the filings already before the Court while Defendant chose to file a Supplemental Brief [Doc. 23]. In Defendant's filing he contends that in considering the testimony given during the hearing by Officer Jaynes and all information available to law enforcement at the time of the stop "the totality of the circumstances did not provide [Officer] Jaynes with reasonable suspicion to conduct a *Terry* stop of [Defendant]." [Doc. 23, p. 5].

## II. FINDINGS OF FACT

FBI Task Force Officer Joe Jaynes ("Officer Jaynes") was the only witness who testified at the hearing. He advised that he is a 22-year law enforcement veteran. He has a bachelor's degree in criminal justice from East Tennessee State University ("ETSU") and served as a corrections officer in Sullivan County, Tennessee before completing the Walters State Police Training Academy and joining the Johnson City Police Department in 2004. He worked as a patrol officer for 10 years before being promoted and working as an investigator from 2014 to 2019, when he was assigned to the FBI task force.

At approximately 2:00 p.m. on February 10, 2021, Office Jaynes was on the phone in his office when he heard an emergency tone on the hand-held dispatch radio on his desk. The tone drew Officer Jaynes' attention to the radio, where the dispatcher was advising that a robbery had just occurred at 815 W. Walnut Street, Johnson City, Tennessee. Officer Jaynes ended his call, took the dispatch radio, got in his car, and proceeded to the area of the robbery. Officer Jaynes was wearing a shirt and tie with his badge and gun visible and was in his police-issued vehicle, an unmarked Toyota Camry. The report from dispatch was that a white male had robbed a store on W. Walnut Street near ETSU and left on foot.

By the time Officer Jaynes arrived in the area where the robbery had occurred, the officer who initially responded to the robbery had sent out pictures of the suspect captured by the store's video surveillance camera. Officer Jaynes received and reviewed the images on his department-issued cell phone. Since the suspect left on foot there was reason to believe he would still be in the area where the robbery occurred, so Officer Jaynes began looking for someone who matched the description and photograph he had of the suspect. He explained that the initial pictures received were photographs that the responding officer took of the security monitor, so the resolution was not very good, and the pictures were small. A radio dispatch went out alerting officers that a picture of the suspect was being sent out and described the picture as showing a suspect wearing a white jacket, dark green gaiter-type mask, and a bluish hat. Officer Jaynes testified that in the initial photos he received he observed the suspect wearing a black hat, a black neck gaiter, sunglasses, and a large bright blue jacket with what appeared to be a black jacket underneath.[1] Radio dispatches also went out that included an estimation of the suspect's height at 5'2" and advised

---

[1] The photographs that Officer Jaynes received were entered as Exhibits 2-4 during the hearing and depict a suspect wearing a bright blue jacket, what appears to be a black hat, and a dark-colored gaiter mask.

that Defendant had used a silver knife of about 10 inches in length in committing the robbery. Officer Jaynes testified he was aware of the report that the suspect had used a knife but was unsure if he heard the specific description of the knife and did not recall hearing the description of the suspect's height.[2] Officer Jaynes testified that he did not hear the audio of the 911 call reporting the robbery before he encountered Defendant and was primarily referencing what he saw in the photographs he received when looking for the robbery suspect.

Approximately 20 minutes after the robbery, Officer Jaynes saw Defendant approximately a block away from the location of the robbery. Officer Jaynes admitted the location where he encountered Defendant was in the opposite direction of the way the suspect reportedly fled, but explained it is not uncommon for a fleeing suspect to change direction to try to avoid detection. Defendant was wearing a black jacket, a black hat, a black neck gaiter, and blue jeans[3] and had a bulge in his right front pants pocket.[4] Officer Jaynes did not recall if Defendant was holding or carrying anything but did remember thinking that the bulge in Defendant's right front pocket could have been either the knife used, or money taken during the robbery. When Officer Jaynes was questioned on cross examination about how it would be possible for a knife with the long blade the robbery suspect had purportedly used to have been carried in a front pocket, the officer admitted it would be unlikely but testified that he had seen it happen during his time in law enforcement. Defendant was not wearing a bright blue jacket or sunglasses, but Officer Jaynes

---

[2] Defendant is 6'3" but Officer Jaynes was primarily referencing the photos, which did not clearly depict the suspect's height.

[3] One of the photographs Officer Jaynes received [Gov. Ex. 3] appears to show the suspect wearing khaki or brown pants; however, the suspects pants cannot be seen at all in another of the photographs [Gov. Ex. 2], and in the final photograph [Gov. Ex. 4] the suspect appears to be wearing jeans. Based on the photographs and information available, it would have been reasonable to believe the suspect might have been wearing jeans.

[4] A surveillance video was introduced [Def. Ex. 2] that purportedly shows Defendant in the clothing he was wearing when he was encountered by Office Jaynes. In the video, Defendant is wearing a black hat, a black gaiter-style mask, a black hoodie with a gray t-shirt underneath, jeans, and brown work boots.

explained in his training and experience it is common for robbery suspects to shed items of outer clothing to avoid detection. Officer Jaynes provided specific examples of robbery suspects removing outer clothing items from his personal experience to support this assertion. Additionally, he advised that in his experience crime victims often have difficulty relaying facts related to the crime due to the stress of the event.

Upon noticing Defendant, who he believed was a potential match to the photographs and information he had received, Officer Jaynes approached him, identified himself and asked Defendant to speak with him. Defendant refused to speak with Officer Jaynes and stated "No, I didn't do anything," and continued walking away. Officer Jaynes decided he needed to detain Defendant to determine if he was indeed the robbery suspect. Office Jaynes explained that he intended to conduct a pat down of Defendant to determine if he was in possession of any weapons, specifically a knife like the one used in the robbery, or money in an amount similar to what had been taken. Officer Jaynes grabbed Defendant's arm to stop him, and Defendant attempted to pull away. When Officer Jaynes tried to gain control of Defendant to handcuff him so he could conduct a *Terry* pat down, Defendant reached towards his right front pocket and said something to the effect of, "I'm gonna grab something here." This caused Officer Jaynes to fear for his safety because of the possibility that Defendant might be reaching for a weapon, so he pushed Defendant against a rock wall to prevent him from accessing his pocket. Another officer responded to assist, and they were able to detain Defendant and conduct a pat down, during which a loaded pistol was recovered from Defendant's right front pocket. Defendant was then arrested and transported to the Washington County Detention Center. The total amount of time between Officer Jaynes's initial

stop of Defendant and Defendant's transport to the Washington County Detention Center was approximately 20 minutes.[5]

### III. ANALYSIS

Defendant asks the Court to find that Officer Jaynes's *Terry* stop and pat down of him violated his Fourth Amendment rights. To determine whether Defendant's position has merit, the Court must assess whether Officer Jaynes had reasonable suspicion to initiate the stop and pat down at issue.

"The Fourth Amendment's prohibition on unreasonable seizures allows temporary investigative detentions, known as *Terry* stops, so long as there is a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. McAllister*, 39 F.4th 368, 373 (6th Cir. 2022) (cleaned up). Likewise, the Fourth Amendment's prohibition against unreasonable searches "permits precautionary searches for weapons following a lawful *Terry* stop, known as Terry frisks, where there is 'reasonable suspicion that the person searched may be armed and dangerous.'" *Id.* (quoting *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)). The degree of suspicion required to justify a Terry stop is quite low, that is, "a moderate chance of finding evidence of wrongdoing." *Id.* (quoting *Stafford United Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370-71 (2009)).

The Sixth Circuit has developed a two-prong test for determining whether an unlawful seizure took place during a *Terry* stop. *United States v. See,* 574 F.3d 309, 313 (6th Cir. 2009). First, the Court must determine whether law enforcement was "aware of specific and articulable

---

[5] The CAD report was introduced as an exhibit [Def. Ex. 4], which reflected that Officer Jaynes reported he was checking a white male near the intersection of Cherokee and Maple (Defendant) at 2:16 p.m. and Defendant was en route to Washington County Detention Center at 2:36 p.m. Defendant was booked into the Washington County Detention Center at 2:59 p.m. [Def. Ex. 3].

facts which gave rise to reasonable suspicion." *Id.* Second, the Court must examine "the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* In conducting this analysis, the Court determines: "(1) if the detention was sufficiently limited in time, and (2) if the investigative means used [were] the least intrusive means reasonably available." *See*, 574 F.3d at 313. The totality of the circumstances is considered to determine whether a *Terry* stop was sufficiently supported by reasonable suspicion. *McAllister,* 39 F.4th at 374; *see also United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (observing that "[courts] are charged to determine whether the *combination of factors* considered by the officer is sufficient for reasonable suspicion.") (emphasis in original). The totality of the circumstances may include an officer's own observations and inferences the officer may draw based on his experience and training, information received from reports and dispatch, and '"commonsense judgments and inferences about human behavior.'" *McAllister,* 39 F.4th at 374 (quoting *Illinois v. Wardlow*, 538 U.S. 119, 125 (2000)). For a *Terry* stop to be justified, an officer must have a "particularized…basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 417, 417-18 (1981)). "The same principles apply to Terry frisks, which require reasonable suspicion that the suspect is armed and dangerous." *Id.* at 374-75.

The Court begins its analysis by asking whether there was a moderate chance of discovering evidence of wrongdoing when Officer Jaynes stopped Defendant. In making this determination, the Court must consider the totality of the circumstances. When Officer Jaynes stopped Defendant, he was aware that roughly 20 minutes prior a burglary had taken place approximately 1 block away and that a white male suspect had fled on foot. Officer Jaynes knew that the suspect had used a knife during the commission of the burglary and had received

photographs of the suspect on his police-issued cell phone, which he reviewed. In the photographs, Officer Jaynes observed the suspect wearing what he believed to be a black hat, a black neck gaiter, sunglasses, and a large bright blue jacket with what appeared to be a black jacket underneath.[6] Officer Jaynes also knew from his training and experience that it is not uncommon for a suspect to shed outer clothing items after committing a crime to try to avoid detection. Although a dispatch reporting the suspects height as approximately 5'2" had gone out, Officer Jaynes testified he did not recall hearing that dispatch.

When Officer Jaynes encountered Defendant, he was wearing a black jacket, a black hat, a black neck gaiter, and blue jeans and had a bulge in his right front pants pocket. Although there are noticeable differences between the appearance of Defendant and the appearance of the suspect in the photographs, Officer Jaynes concluded, based on his training and experience, that it was possible that Defendant had shed the sunglasses and blue jacket seen in the surveillance photos provided to avoid detection after committing the robbery. He also believed the bulge in Defendant's pocket could have been the knife used to commit the robbery, or the money stolen from the store.

Defendant argues that at the time of the stop Defendant's general appearance did not match the description received by Officer Jaynes. [Doc. 23, p. 4]. However, Officer Jaynes testified that he was primarily using the photographs he received to inform him regarding the suspect's

---

[6] Defendant argues that the suspect's khaki pants and black shoes are also apparent in the photographs. [Doc. 23, p. 2]. However, Officer Jaynes did not testify to observing these details in the photographs, nor were they included in the verbal description that was dispatched. Additionally, the Court is mindful that Officer Jaynes was reviewing the photographs on his cell phone while patrolling the area near where the burglary occurred and searching for the suspect. It is not unreasonable for Officer Jaynes to have focused on the areas of the suspect that were nearest to the camera and most apparent. Further, the suspects pants and shoes are not clearly visible in all of the photographs provided. *See* [Gov. Ex. 2-4].

appearance,[7] and although he noted some differences between the photograph and Defendant's appearance, he also noted a significant number of similarities. Further, based on his training and experience it was likely the suspect's appearance, in terms of clothing worn, would have changed to some degree after fleeing the scene of the robbery. Defendant also argues the fact that he was observed by Officer Jaynes less than two blocks from the scene of the robbery more than fifteen minutes after the robbery occurred further indicates that it was unreasonable to consider Defendant a suspect. *Id.* However, as Officer Jaynes explained during his testimony, it is not uncommon for a suspect to change direction when fleeing, which could increase the amount of time necessary for the suspect to distance himself from the scene of the crime. Additionally, Officer Jaynes explained that in some instances a suspect may "lay low" near the scene of the crime to try to avoid being discovered.

Here, Defendant's clothing reasonably matched what Officer Jaynes observed in the photographs he received of the suspect, Defendant was in the general area of the robbery within a relatively short time after it was committed, and Defendant had a bulge in his pocket that Officer Jaynes believed could have been the weapon used during the commission of the offense. Further, it was permissible for Officer Jaynes to rely upon his training and experience in forming reasonable suspicion, as he did when concluding that Defendant could have shed outer articles of clothing to avoid detection. *McAllister,* 39 F.4th at 374. The totality of the circumstances demonstrates that Officer Jaynes had a particularized basis for suspecting Defendant was involved in criminal activity when he stopped defendant. *Id.*; *Cortez*, 449 U.S. at 417-18.

---

[7] The Court notes that the verbal description of the suspect that was dispatched differs significantly from the surveillance photographs sent out and describes the suspect as wearing a white jacket and bluish hat. Given these obvious discrepancies, it is not unreasonable for Officer Jaynes to rely on his own observations of the photographs to inform him regarding the suspect's appearance.

Having determined that the *Terry* stop of Defendant was proper, the Court must now determine "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). This requires determining whether the stop was sufficiently limited in time and whether the investigative means used were the least intrusive means reasonably available. *Id.* "Simply put, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Here, Defendant was detained for at most 20 minutes before being arrested and transported to the Washington County Detention Center. At the time Defendant was stopped, Officer Jaynes had reasonable suspicion to believe Defendant might have just committed an armed burglary and was in possession of the weapon used to commit the crime. After Officer Jaynes initially stopped Defendant, Defendant reached towards his right front pocket, which Officer Jaynes already suspected may contain a weapon, causing Officer Jaynes to fear for his safety. Officer Jaynes pinned Defendant against a wall and to prevent him from accessing his pocket and held him in place until backup arrived.

The purpose of the stop was to investigate whether Defendant was indeed the robbery suspect and whether the bulge in his front pocket was either the knife used in the commission of the robbery, or the money taken from the store. Considering the surrounding circumstances, Defendant's detention was sufficiently brief to achieve the purpose of the stop and was effectuated using the least intrusive means available. Defendant's attempt to pull away and reach towards his front pocket could have reasonably been interpreted as an attempt to resist arrest and flee, which

justified the use of some degree of physical coercion to detain Defendant by pinning him against the wall until backup arrived. *See Lee v. Hefner*, 136 F. App'x 807, 812 (6th Cir. 2005) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an…investigatory stop necessarily carries with it the right to use some degree of physical coercion…to effect it." (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Once officers gained control of Defendant, a *Terry* frisk was conducted, and a loaded pistol was discovered in Defendant's right front pocket. That *Terry* frisk was properly conducted because Officer Jaynes had a reasonable basis for believing that Defendant was the robbery suspect he was searching for and was in possession of the knife used to commit the crime, making him potentially armed and dangerous. *McAllister*, 39 F.4th at 373; *see also Pacheco*, 841 F.3d at 390 (holding that "[u]ltimately, the test [for whether a *Terry* frisk was warranted] is whether a 'reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" (quoting *United States v. Noble*, 762 F.3d 509, 521-22 (6th Cir. 2014)).[8]

## IV. CONCLUSION

Based upon the totality of the circumstances, the Court concludes that the *Terry* stop and frisk of Defendant were supported by reasonable suspicion and did not violate Defendant's rights under the Fourth Amendment. Accordingly, and for the reasons outlined above, the undersigned

---

[8] In its Response, the United States argues that in addition to the *Terry* frisk being justified, Defendant's resistance to the *Terry* stop and reaching towards his pocket constituted an arrestable offense; therefore, Officer Jaynes was authorized to conduct a search of Defendant's person incident to lawful arrest. Because the Court has concluded that the *Terry* frisk used to determine whether Defendant was in possession of any weapons was justified, the need for addressing whether a search incident to arrest was warranted has been obviated.

**RECOMMENDS** that Defendant's Motion to Suppress [Doc. 16] be **DENIED**.[9]

                              Respectfully Submitted,

                              /s Cynthia Richardson Wyrick
                              United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).